IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case Nos. |
| | : | |
| JASON R. SMITH; | : | 1:07-CR-129-01 |
| GREGG JUNNIER; and | : | 1:07-CR-129-02 |
| ARTHUR B. TESLER | : | 1:08-CR-424-01 |

**GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM FOR
DEFENDANTS SMITH, JUNNIER, AND TESLER AND
MOTION FOR DOWNWARD DEPARTURE BASED UPON SUBSTANTIAL ASSISTANCE
FOR DEFENDANTS SMITH AND JUNNIER**

Comes now the United States of America, by and through David E. Nahmias, United States Attorney for the Northern District of Georgia, Jon-Peter F. Kelly, Assistant United States Attorney, and Paige M. Fitzgerald, Special Litigation Counsel with the Criminal Section of the Civil Rights Division, U.S. Department of Justice, and files this consolidated sentencing memorandum for the three above-named defendants in these two related cases, which also incorporates as Section III below the Government's motion, pursuant to U.S.S.G. § 5K1.1, for downward departure from the applicable sentencing guideline range for defendants Smith and Junnier, based upon their substantial assistance to authorities.

The three defendants are now scheduled to be sentenced on February 23, 2008.  Each defendant entered a negotiated plea agreement that includes binding sentencing guideline calculations that have been accepted by the Court.  In addition to those

guideline calculations, as discussed below, defendant Junnier has provided exceptional assistance in the investigation and prosecution of other persons, and the Government will recommend a substantial downward departure at sentencing.  Defendant Smith has also provided sufficient assistance to qualify for a § 5K1.1 motion, and the Government will recommend a limited (no more than 10 to 20 percent) downward departure at sentencing.  Defendant Tesler has not provided substantial assistance to date and the Government does not file a § 5K1.1 motion on his behalf.

As discussed at length below, the guideline calculations, including the agreed-upon departures in light of the unusual circumstances of the case and the recommended departures for substantial assistance, fully reflect and account for the sentencing factors set forth in 18 U.S.C. § 3553(a).  Accordingly, the guideline sentences are entirely reasonable and no variances pursuant to the Court's authority under *United States v. Booker*, 543 U.S. 220 (2005), are necessary or appropriate.  Indeed, defendant Smith is precluded by the terms of his plea agreement from seeking any variance, thereby agreeing that a guideline sentence is reasonable.  While the Government expects defendants Junnier and Tesler to seek variances, their requests should be denied.[1]

---

[1] As the Court may recall, defendants Smith and Junnier each also entered a guilty plea to related state charges pursuant to a plea agreement in Fulton County Superior Court on the same day that

I.  **THE OFFENSE CONDUCT INVOLVED A LONG-TERM CONSPIRACY BY THE DEFENDANTS TO VIOLATE THE CIVIL RIGHTS OF CITIZENS IN ATLANTA, RESULTED IN THE SHOOTING DEATH OF AN INNOCENT ELDERLY WOMAN, AND THEN CONTINUED WITH A SOPHISTICATED AND EXTENDED COVER-UP SCHEME.**

   A.  **The Defendants Engaged in A Long-Term Conspiracy to Violate the Civil Rights of Citizens in Atlanta.**

---

they entered their federal guilty pleas and plea agreements (see Exhibit 2 to defendants Smith's and Junnier's federal plea agreements).  The state plea agreements provide that the Fulton County Superior Court will defer imposition of the state sentence until this Court sentences defendants Smith and Tesler, and that the State will then recommend that the Superior Court sentence the defendants to a prison term equal to, and to run concurrent with, the sentence imposed by this Court.

Defendant Tesler declined to enter a plea agreement with the State.  He was then indicted in Fulton County Superior Court on charges of violation of oath of office, false imprisonment, and making false statements during his first FBI interview.  (He was not charged with conspiracy, civil rights, obstruction of justice, extortion, or similar charges of the sort he faced under federal law, which in many ways better fit his criminal conduct.)  The state jury convicted Tesler only of the false statement charge, and Judge Michael Johnson sentenced him to serve 4 ½ years (of the statutory maximum 5 years) in prison.  That conviction has since been reversed by the Georgia Court of Appeals on venue grounds, although Tesler remains eligible for re-trial with proper venue (pending his petition to the Georgia Supreme Court seeking reversal of that portion of the opinion).  Defendant Tesler's federal plea agreement does not directly control the issue of how a state re-trial would affect his federal sentence.  However, the Fulton County District Attorney has indicated to the Government that his office does not intend to re-try Tesler or seek Tesler's re-trial in DeKalb County so long as Telser continues to admit that he made false statements during his first FBI interview and receives an upward adjustment in his sentence due to that obstructive conduct, which is provided for by the binding sentencing guideline calculations as discussed below.  In any event, the Government believes that Tesler is entitled to full credit against his federal sentence for time served on his state conviction, which was based upon conduct that is relevant conduct to and was part of the federal offense.  See U.S.S.G. § 5G1.3(b).

Ms. Kathryn Johnston was a law-abiding 92-year-old woman, the sole resident of her modest house at 933 Neal Street in Atlanta. On the evening of November 21, 2006, Ms. Johnston died in a hail of bullets fired at her as she stood in that home -- bullets fired by Atlanta Police officers who had no lawful right to be breaking through her door.   This tragedy was not the result of some isolated, aberrant misstep by officers who otherwise strictly abided by proper police procedures and constitutional requirements. Instead, it was the foreseeable and perhaps inevitable culmination of a long-standing conspiracy in which the three defendants repeatedly and routinely ignored police procedures and violated their oath of office and the Fourth Amendment to the Constitution.

The facts underlying this conspiracy are set forth in detail in the Presentence Reports (PSRs)[2], but it is important to note that this conspiracy began more than a year before Ms. Johnston was killed.  Defendant Junnier, the senior officer of the group, joined the Atlanta Police Department (APD) in 1988 and began working as a detective in the Narcotics Unit in September 1998.  Defendant Smith became an APD officer in 1999 and joined the Narcotics Unit in June 2005.  Defendant Tesler also became an APD officer in 1999, after

---

[2] Defendant Tesler's PSR sets forth the details of the conspiracy more thoroughly than the other two defendants' PSRs, because the Government's investigation had gathered more evidence by the time of Tesler's guilty plea, including information provided by Junnier and Smith.

4

serving for five years as a military police officer; Tesler joined the Narcotics Unit in January 2006.

Throughout their tenure in the unit, these defendants falsified information to obtain search warrants from Fulton County Magistrate Judges.  For example, in an incident occurring just a week before the Neal Street shooting, defendant Junnier obtained and the narcotics unit then executed a search warrant for a residence at 161 Rhodesia Drive based upon a fictitious controlled buy; no drugs were found at the residence.  It was a common practice for the defendants to use "hand-offs," in which one officer would provide information to establish probable cause to a second officer, who would then write the affidavit swearing that he had firsthand knowledge of the information, even when the affiant had not even been present at the location.  If a drug purchase became stale, the defendants would sometimes "freshen" the probable cause in the affidavit by falsely swearing that the officer had conducted recent surveillance where he witnessed drug activity at the location to be searched.  The defendants regularly swore falsely in search warrant affidavits that they patted down their informants before and after sending them to make a drug purchase, when in fact the officers rarely, if ever, did so.  The defendants also regularly swore falsely that they personally observed the informant purchase drugs, when they did not actually observe the transaction and often were not even in the vicinity.  Additionally,

5

as defendant Tesler knew, defendants Junnier and Smith sometimes padded their vouchers for reimbursement of purported payments to informants, using the falsely obtained police funds for such things as unit cookouts and to pay incidental expenses.

Despite some claims about lack of training regarding search warrants, it is clear that the defendants knew what was required by police policy and what was needed to obtain a lawful search warrant, because their affidavits almost always set forth facts indicating that they had followed procedure and established probable cause.  Unfortunately, many of those "facts" were simply untrue.  And there is no question that the defendants knew that lying under oath to a judge was wrong and illegal, and that no one in the Atlanta Police Department could or did authorize such false statements (although the defendants' immediate supervisor, Sergeant Wilbert Stallings, who is charged with a separate civil rights offense in case number 1:08-CR-111-JEC, participated in some such improper activities and turned a blind eye to others).

In this context, the Court should be aware that the Government's investigation revealed that other officers in the narcotics unit were doing their jobs properly.  In other words, it was <u>not</u> inevitable that any APD officer, or even an officer in the narcotics unit, would join the conspiracy or commit similar crimes. Moreover, the defendants cannot be properly characterized as "model" officers except for their "bending the rules" in an effort

to find drugs and drug dealers.  Indeed, it appears that one reason the defendants failed to take the necessary steps to establish legitimate probable cause was that they were spending so much of their on-duty time illegally working on numerous so-called "extra jobs," leaving them less time to follow proper police and constitutional procedures.[3]

The defendants were clearly on notice that innocent citizens could be injured or killed in the course of the execution of a search warrant -- particularly a no-knock search warrant.  Just two months prior to Ms. Johnston's death, the defendants participated in the execution of a search warrant during which no drugs were found but another member of the narcotics unit almost shot a 79-year-old woman who was holding a lifelike toy gun.  On another occasion, defendants Smith and Tesler participated in the execution

---

[3] As described in more detail in defendant Tesler's PSR at paragraphs 20-24, the defendants provided numerous businesses in the high-crime areas of Atlanta where they worked with so-called "security" or "consulting" services in exchange for weekly cash payments.  The services consisted primarily of providing considerably more police presence and response than was received by citizens who did not make such payments, including while the defendants were on-duty and supposed to be serving all of the citizens in the area.  The on-duty "extra jobs" scheme could also be charged separately as a color-of-official-right extortion offense under 18 U.S.C. § 1951 (as was done in the case of former APD officer Daniel J. Betts, No. 1:08-CR-023-JEC); that was not done as to these defendants given their guilty pleas and the fact that the extortion charge would not affect their guideline sentences.

of a search warrant that discovered not drugs or a drug dealer, but an elderly gentleman and his young ward watching television.

Despite their knowledge of wrongfulness of their actions and the risks, the defendants routinely failed to follow proper procedure and then lied under oath to obtain search warrants, resulting in the routine violation of the Fourth Amendment rights of citizens in Atlanta -- constitutional protections designed, in part, to ensure that police have real probable cause to believe that criminals and contraband are in a residence before they can enter that home, thereby greatly reducing the risk that innocent citizens like Kathryn Johnston will be needlessly killed.

The Government assesses that, in this underlying, long-term conspiracy to violate civil rights, defendant Junnier was the most culpable of the three defendants.  As the most senior narcotics officer, he served as an example to his two colleagues, and he was also primarily responsible for establishing and overseeing the "extra jobs" scheme.  Defendant Smith was the second most culpable, and defendant Tesler was the least culpable, in the conspiracy before the events of November 21, 2006.[4]  It should be recognized,

---

[4] We note, however, that the reduced culpability for Smith and Tesler is more a function of the amount of time each spent in the narcotics unit, rather than less egregious conduct or willingness to engage in criminal conduct during that time.  For example, defendant Tesler authored approximately 20 search warrant affidavits during his 10 months in the unit.  It appears that all but one of the affidavits contain material false statements, and in at least three of them, he swore to participating in a controlled buy for which he was not even present.  Likewise, the majority of

however, that this aspect of the conspiracy – civil rights violations that, while serious, repeated, and highly corrosive to the rule of law, did not result in any serious bodily injury or death – is and should be a less significant component of the sentence calculations in this case.  See U.S.S.G. § 2H1.1(a)(2) & (b) (setting offense level of 18 for civil rights conspiracy by police officers that does not involve a more serious underlying offense or other aggravating factors).

**B.    The Conspiracy Culminated in the Shooting Death of an Innocent Elderly Woman.**

The details of the events on November 21, 2006, are again set forth in the presentence reports.  In short, the defendants chose to rely upon the uncorroborated representations of an uncertified, unreliable street-corner drug dealer -- someone defendant Tesler had roughed up during his arrest, who was told he was facing his "third strike," and who had not provided reliable information in the past -- to secure a no-knock search warrant for a citizen's home.  The defendants were motivated in part by the dealer's claim that he had seen a kilogram of powder cocaine in the house, a potential huge find for narcotics officers who very rarely seized more than a few rocks of crack.  The defendants had the dealer direct them to the purported house to identify it, but did nothing more to corroborate the information.  They did not observe any

---

Smith's search warrants were also false in material respects.

apparent drug activity there, check property records to see who lived there, nothing.   They recognized that they should do a controlled buy to corroborate the dealer; indeed, Junnier contacted their most-used confidential reliable informant (CRI), but the CRI was unavailable.

Nevertheless, the defendants agreed to proceed with a search warrant.  Defendant Smith took the lead and drafted the affidavit. He misleadingly attributed the information received from the unreliable dealer to a confidential, reliable informant; falsely swore that the CRI had made a controlled buy of crack cocaine at 933 Neal Street that day; and cut-and-pasted more of the co-conspirators' routine false statements as well (that he had searched the CRI, that he observed the buy, that another officer (Tesler) had been with him, etc.).   He also included false information about surveillance cameras in the house to seek authority to execute the search without the officers' first knocking and announcing themselves as police.  Smith then presented the falsified affidavit to a Fulton County Magistrate Judge; because the facts as sworn to by defendant Smith in the affidavit established probable cause, the Magistrate Judge issued the "no-knock" search warrant.

The defendants and other members of the narcotics team then met at a firehouse near 933 Neal Street to prepare to execute the warrant.   Defendant Smith briefed the team on the search,

recounting as if true the substance of the falsified affidavit. Defendants Junnier and Tesler were present during the briefing and aware that the warrant was based upon false information, but they did nothing to correct Smith's briefing or to alert the non-conspirator officers that they would be participating in the execution of a falsely obtained search warrant.[5]

---

[5] During the course of the investigation and interviews with the FBI, each of the defendants has acknowledged that, prior to the execution of the search warrant at 933 Neal Street, he knew that the warrant had been obtained based upon false information. Defendant Junnier has been consistent in his acknowledgment that he participated in the execution of a warrant he knew to be false.

During his January 9 and 10, 2007 proffer with the FBI, defendant Smith acknowledged that he knew that the CRI had not made a buy before the warrant was executed, and that the crack cocaine he falsely ascribed to the CRI's buy actually came from the unreliable drug dealer arrested earlier in the day. Smith has subsequently claimed that while he was writing the affidavit, he believed that defendant Junnier had directed a CRI to make a buy at 933 Neal Street and that a buy had taken place while he was obtaining the warrant, claims contradicted by, among other things, his prior statements and the timeline of events.

During his first, December 7, 2006 interview with the FBI, in which he recounted the defendants' false cover story, Tesler explained that during the pre-search briefing, Smith recounted the information from the purported buy at 933 Neal Street; tellingly, whether or not Tesler heard the briefing was not a point about which he needed to lie (since his story at the time was that he had actually observed the buy being made). During his January 4, 2007 proffer with the FBI, which he asserts was entirely truthful, Tesler likewise acknowledged hearing Smith pretty much read the false warrant during the pre-search briefing, and Tesler further stated that he absolutely did not believe that a buy had been done at 933 Neal Street at that time. Indeed, Tesler went on to provide the agents with a detailed explanation for why he had not confronted Smith at the briefing about that critical false statement. However, Tesler has subsequently claimed that he was unaware of the content of the search warrant and indeed testified

11

A team of armed APD narcotics officers massed at the front door of 933 Neal Street shortly after dark; defendant Tesler and Sergeant Stallings were assigned to cover the rear of the house. With a no-knock warrant, the officers did not announce their presence, and it took them a minute or more to breach the burglar bars covering the door.    During this time, Kathryn Johnston apparently heard people trying to break into her home and came to the door with her old revolver.    There is no evidence that drugs had ever been sold from her home or that any other criminal conduct had occurred there; there would have been no reason for this 92-year old woman to expect that the intruders were police officers. Literally as the officers rammed open the door, Ms. Johnston attempted to defend herself, firing a single shot through the

---

during his state trial that he was on his cell phone talking to his wife and standing "15-20 feet away" from Smith during the briefing, so that he could not hear what Smith was saying.  That new story is contradicted by Tesler's previous statements; by defendants Smith and Junnier and numerous other officers present at the briefing, who have provided interviews and federal grand jury testimony indicating that Tesler was standing with them within a few feet of Smith; as well as by telephone records and the timeline for the events that evening.

While the Government is troubled by Smith's and Tesler's inconsistency on this point and believes that these two defendants have attempted at times to minimize their roles in the events leading to the death of Kathryn Johnston, we believe that they have in their guilty pleas admitted the conduct (elements) comprising the civil rights conspiracy offense.    Therefore, assuming no changed circumstances before sentencing, and noting that it is a particularly close question with regard to Tesler, the acceptance of responsibility adjustment under U.S.S.G. § 3E1.1 should remain appropriate.

wooden door into the ceiling outside, striking no one.  Themselves believing they were under fire from the "drug dealer" in the house, defendants Smith and Junnier and four other officers returned fire, their initial shots also going through the door.  Five or six of the 39 shots fired stuck Ms. Johnston, including one that struck her chest and was fatal.  Ballistics and other forensic evidence are unable to determine which of the six officers fired the shots that struck Ms. Johnston.  Defendant Junnier and two other officers were wounded by "friendly fire" or resulting shrapnel and debris.[6]

The Government assesses that defendant Smith is the most culpable of the co-conspirators in the activities on November 21, 2006 that directly led to the killing of Kathryn Johnston -- which is the tragic event that should and does most significantly affect the length of the sentences in this case.  Smith is the defendant who swore out the false affidavit and then falsely briefed his teammates on the substance of that affidavit.  His actions led most directly to Ms. Johnston's death and also endangered the lives of

---

[6] Because defendant Tesler was assigned, as was often the case given his junior tenure on the team, to cover the rear of the house, he did not fire his gun during the exchange.  There is no evidence, however, that Tesler requested his assignment because of concerns about the search warrant; indeed, all evidence suggests that had Tesler been with the officers entering the house, he also would have fired shots.  In any event, the criminal culpability of all three defendants is based upon their conspiracy to violate civil rights that led foreseeably to Kathryn Johnston's death, not the specific intent of any of the defendants to kill her or anyone else.

his fellow officers, including the two non-conspirators who suffered gunshot wounds during the shooting.

We believe that defendant Junnier (who at least tried to set up a controlled buy) as well as defendant Tesler are somewhat less culpable than defendant Smith in this phase of the conspiracy. But they too are responsible for executing a search warrant they knew and certainly could foresee was based upon false information and thereby failed to protect the civil rights of Ms. Johnston and to alert their fellow officers of the risk. All three defendants could have prevented this tragedy, but instead they each abandoned their obligations as police officers and law-abiding citizens, leading to the death of an innocent woman.

**C.   The Defendants Engaged in a Sophisticated and Extended Cover-up Scheme.**

Beginning immediately after the shooting, the defendants began a carefully orchestrated campaign intended to protect their conspiracy and conceal their misconduct. First, in an effort to make it appear that 933 Neal Street was in fact a "drug house" rather than the home of an innocent elderly woman, defendant Smith -- with the knowledge of defendant Tesler -- planted drugs in Ms. Johnston's basement, several baggies of marijuana from a stash that the defendants had seized earlier that day in another location. In calls and a meeting in Junnier's hospital room, the defendants then agreed to a cover story: they would claim that their most-used

14

confidential reliable informant ("the CRI") had made the buy at 933 Neal Street described in the affidavit, and get the CRI to back up that story.

The night of the shooting was clearly stressful and shocking to the defendants.  But their cover-up did not end after they had a chance to reflect on the tragedy they had created, and to consult with family, friends, and counsel.  To the contrary, over the following several days each of the defendants perfected the cover story and took multiple steps to bolster it.  All three defendants had telephone conversations with the CRI to encourage him to support the story and to provide or obtain from him details to make the story as believable as possible.  Defendants Smith and Junnier also made arrangements to give the CRI extra money as an incentive for him to cooperate.

The day after the shooting, defendant Tesler drafted, signed, and filed a false police report crafted to match the false affidavit and cover story.  (Tesler also included some extra false details – such as the entirely fictitious claim that he had surveilled the unreliable drug dealer engaged in suspicious activity before apprehending him – that would reflect good police procedure but were unnecessary to the cover story.)  Defendant Smith also realized that he still had the remainder of the marijuana stash from which he had taken the drugs he planted in Ms. Johnston's basement, which might be matched to the planted drugs if

he turned it into evidence.  Instead, he had the idea to destroy that evidence.  He retrieved the marijuana from their police car, and with defendant Tesler drove in Smith's personal vehicle to a street near police headquarters, where Tesler threw the drugs down a storm drain.[7]

When APD Homicide detectives, who conducted the initial investigation of the Kathryn Johnston homicide, interviewed the defendants the day after the shooting, defendants Junnier and Smith provided the false cover story.  Defendant Tesler was interviewed last and not asked about the events that occurred before the execution of the search.

As the investigation and public concern intensified, the defendants had multiple meetings over a period of many days during which they fine-tuned their false story, all the way down to describing the smell in the CRI's vehicle when he was purportedly searched before making the buy at 933 Neal Street -- an informant and a car they never laid eyes on that day.  They even drove the route described in their false story to try to get the details

---

[7] During his state trial, Tesler testified that he only went with Smith to dispose of this evidence because he feared Smith, and that when Smith stopped his truck, Smith got out and threw part of the marijuana down the sewer and then directed Tesler to throw the rest of it away.  Tesler did not tell this tale in any of his prior statements, in his proffer, or in his state grand jury testimony, and it has been flatly contradicted by Smith, both regarding any intimidation and regarding who threw the marijuana down the sewer. (Smith explains that he was simply going to throw the drugs out his window, as was his practice.)

exactly right.  Defendant Junnier also tried to persuade defendants Smith and Tesler to "cover" him on the earlier search warrant for the residence on Rhodesia Road, in which Junnier was the affiant and fabricated a controlled buy.

The cover up in this case was remarkably choreographed and quite sophisticated.  To protect their conspiracy, the defendants were willing to besmirch the reputation of the innocent woman who was killed as a result of their conduct (one of the most distressing issues for the family and friends of Kathryn Johnston).  Smith planted evidence; he and Tesler destroyed evidence; Tesler filed a false police report; they all enlisted an uninvolved citizen to lie for them, and Smith and Junnier tried to pay the CRI to do so; and they all made false statements to investigators.  Had Ms. Johnston not been killed or seriously injured, or had the victim been a young drug dealer, their conspiracy might well have continued undetected, at least until some other citizen became a victim.  The first clear indication that the shooting of Kathyrn Johnston had not been just a terrible mistake occurred only when the CRI became scared that he was being scapegoated for the homicide and might even be harmed by the defendants or their associates, and decided to contact federal ATF agents he knew, and then the media, to say that he had not actually made a buy at 933 Neal Street.  Those revelations led APD to ask the FBI to take over the investigation.

17

To his considerable credit, Junnier then told the truth in his first FBI interview.  But Tesler a few days earlier, and Smith a few days later, lied profusely in their first FBI interviews, sticking to the cover story.  Only when it became clear that "the jig was up" did defendants Smith and Tesler admit what they had done, and each has since backtracked to some extent (including Tesler's testifying falsely before the state grand jury and at his state trial).[8]

The Government assesses that defendant Smith was the most culpable of the defendants during the cover-up portion of the conspiracy -- efforts to obstruct justice which should and do have

---

[8]  In his statement to the Probation Officer, defendant Tesler admits that he lied in his first interview with the FBI on December 7, 2006, but claims "[h]owever, I could not live with the lies and returned at my request to meet with the FBI on January 4, 2007, to tell them the truth."  Tesler PSR ¶ 70.  That is highly misleading.  Tesler did lie throughout his December 7, 2006 FBI interview.  At the end of the interview, the agents advised Tesler that they would ultimately determine the truth and that the CRI was telling them a much different story; they asked Tesler if he wanted to change or correct anything he had said, but he declined.  Junnier then provided his truthful interview on December 11, 2006, and Smith provided the false story to the FBI on December 20, 2006.  The FBI then requested to meet with Tesler again on December 21, 2006.  At the outset of that meeting, the agents confronted Tesler with some of the information disclosed by Junnier and told Tesler that they did not believe his earlier story.  Apparently realizing that the FBI was quickly unraveling the cover-up, Tesler asked for a break to speak with his attorney, then returned and said he wanted to cooperate but first wanted to consult with his extended family during the holidays.  Only after that did Tesler return on January 4, 2007 to give his truthful proffer.

18

significant impact on the sentences in this case.[9]  Smith planted
the marijuana in the basement of 933 Neal Street, was the first to
call the CRI, had the idea to destroy the remaining marijuana, paid
the CRI, participated in the cover-up meetings, gave a detailed
false statement to the FBI, and was the last of the defendants to
confess.  Defendant Tesler was the second most culpable in this
aspect of the conspiracy.  He knew that Smith was planting the
marijuana, filed a false police report, spoke to the CRI about the
cover story, participated in the cover-up meetings, gave a detailed
false statement to the FBI, and then – after providing a truthful
proffer – backtracked and testified falsely to the state grand jury
and trial jury.[10]  Defendant Junnier was the least culpable in the
cover-up.  Although he called CRI and made arrangements to pay him,
lied to the Homicide detectives, and participated in several cover-
up meetings, Junnier was in the hospital when the marijuana was
planted and did not participate in the destruction of the remaining

---

[9]  Indeed, defendant Tesler was sentenced to serve 4 ½ years
in state prison for just one of his obstructive acts, the false
statements during his first FBI interview.  Moreover, if the
defendants had only assisted in the cover-up and been convicted of
an obstruction offense, rather than participating in and pleaded
guilty to the civil rights conspiracy resulting in death, their
sentencing guidelines range would be only 6 levels less than it is
as a full participant in the conspiracy.  <u>See</u> U.S.S.G. §
2J1.2(c)(1) & 2X31.(a)(1).

[10]  Examples of Tesler's false grand jury and trial testimony
are discussed in footnotes 5 and 7 above.

evidence, wrote no false reports, told the truth in his first FBI
interview, and has remained truthful and consistent ever since.

**D.   The Defendants' Criminal Conduct Had Significant Negative Impact on the Community and the Justice System.**

The defendants are responsible for the violent death of Kathryn Johnston under what must have been excruciatingly terrifying circumstances.   The loss of Ms. Johnston under these circumstances, and the defendants' efforts to besmirch her reputation, obviously also caused great pain for her family and friends, as well as other members of the community.   (The Government attaches as Exhibit 1 a letter from Ms. Johnston's closest relative, Ms. Sarah C. Dozier, and the Court may receive letters before and statements at sentencing with more details.)

But this crime also caused substantial harm to the entire City of Atlanta and neighboring communities, as well as the law enforcement community and the criminal justice system.   As the magnitude of the defendants' misconduct was revealed, especially when its dimensions were uncertain, distrust rose sharply between law enforcement officers and community members -- particularly between APD officers and residents in some of the most crime-ridden areas of Atlanta, but in other areas as well.   Trust between the police and the public is essential to public safety; where citizens fear police officers or believe that the police may target the innocent and let the guilty go free, the entire community suffers. APD responded to the defendants' crimes with greater community outreach, revamped training and oversight, and a complete reorganization of the Narcotics Unit, but even today the memory of

Kathryn Johnston's killing and the revelation of the other routine misconduct committed by these officers (as well as the crimes committed by other officers charged as a result of this investigation) lingers. (The Court may receive letters before or statements at sentencing with more details.)

The defendants' conduct harmed the many honest and dedicated APD officers as well. Directly, the defendants exposed the other officers executing the search warrant for 933 Neal Street to considerable and entirely unnecessary danger; two officers were shot and wounded, and one of them required weeks of medical treatment and was afraid that he might lose his leg. Other officers on the narcotics team were necessarily placed on administrative leave for months while the investigation was ongoing. Many APD officers interviewed in the course of the investigation have indicated that they feel less trust for their fellow officers than before, leading some to consider leaving law enforcement altogether and all to feel less safe on the street. The loss of community confidence and support also hurts every honest police officer, and makes their jobs more difficult and dangerous.

The defendants' conspiracy required an intensive investigation to unravel it and then to determine how far similar misconduct spread within APD. The City of Atlanta faces civil lawsuits and the potential for substantial liability.

22

The justice system itself is also a victim of these crimes. The defendants' misconduct and deception required Fulton County District Attorney's Office personnel to individually review 163 pending and closed cases involving one or more of the three defendants. After that review, the District Attorney's Office had to dismiss charges or modify sentences in 69 cases, including to release some inmates serving sentences based on the defendants' investigation. It is likely that most of the defendants in these cases did in fact commit crimes against the community, but the State's inability to use defendants Smith, Junnier, and Tesler as credible witnesses and their failure to follow proper and constitutional procedures required dropping those cases.

While we do much less work with APD narcotics officers, the United States Attorney's Office also had to devote resources to reviewing numerous pending and closed cases to determine if the defendants and related officers were involved, and we resolved at least one case on more unfavorable terms because one of the defendants was a witness. The District Attorney's Office, and the United States Attorney's Office to a lesser extent, also have had to deal with motions and arguments from defense counsel seeking to question the veracity of other Atlanta police officers -- motions and arguments made because jurors and judges may now have less faith in APD. Indeed, the District Attorney's Office has indicated that it has had to litigate more suppression motions than before,

and that state judges are more likely to disbelieve officers and grant those motions than before.

Thus, the harm caused by these defendants' criminal conduct transcends their direct victim – who of course suffered the ultimate harm.   It has harmed the community, the many honest members of the police force that protects the community, the integrity of the justice system, and indeed, the very Rule of Law in the largest city in this district.

**II.   THE BINDING SENTENCING GUIDELINE CALCULATIONS PROPERLY ACCOUNT FOR THE CIRCUMSTANCES OF THIS CASE AND THESE DEFENDANTS, MAKING ANY VARIANCE UNNECESSARY AND INAPPROPRIATE.**

**A.   The Stipulated Sentencing Guideline Calculations Account for the Defendants' Intent Regarding the Homicide, Higher Duty as Police Officers, Obstructive Conduct, Acceptance of Responsibility, Roles in the Offense, and Lack of Criminal History.**

All three defendants entered negotiated plea agreements pursuant to Federal Rules of Criminal Procedure 11(c)(1)(C) and (d), in which the parties are bound by the agreed-upon sentencing guideline calculations.   In accepting the plea agreements, the Court also accepted those calculations.  These stipulated guideline calculations, which begin with the collective wisdom of the Sentencing Commission and the federal judiciary drawn from thousands of federal cases as reflected in specific applicable guidelines, as well as several departures that account for the unusual circumstances in this particular case, encompass the factors that might otherwise justify a variance and indeed result

in sentences that are entirely reasonable under 18 U.S.C. § 3553(a).

> 1. The Stipulated Base Offense Level Takes into Account the Unusual Circumstances of the Homicide Through a 16-Level Downward Departure.

As the plea agreements provide and the PSRs correctly determine, the base offense level for this conspiracy is 43, because the civil rights offense resulted in a homicide qualifying as First Degree felony-murder:  the death of Kathryn Johnston resulted from the defendants' commission of a state felony (inter alia, violation of their oath of office, which includes complying with the Constitution).  See U.S.S.G. §§ 2H1.1(a)(1), 2A1.1 & comment. (n. 2(B)).  However, the parties and the Court have also agreed that this is not a typical felony-murder based upon a felony that is malum in se, as it might be if the defendants had gone to 933 Neal Street house with the intent of killing or assaulting someone or stealing drugs or money.  The evidence instead shows that while the defendants knew they had no lawful right to enter the house at 933 Neal Street, they subjectively believed that they were in fact going to a drug dealer's home to seize drugs and make an arrest, and indeed they executed the improperly-obtained search warrant with fellow officers who were not involved in the conspiracy.  While entering the house, the officers – two of the defendants but four others as well – responded legitimately to a

25

gunshot they subjectively believed had been fired by the "drug dealer," in fact killing an innocent woman.

Because these unusual underlying circumstances also bear some resemblance to involuntary manslaughter involving criminally negligent conduct (with a base offense level of 12, see U.S.S.G. § 2A1.4(a)(1)), the parties agreed that level 27 was the appropriate base offense level – the midpoint between the felony murder guideline (43) and the involuntary manslaughter guideline (12).[11] In short, the stipulated base offense level already accounts for the defendants' subjective intent and any resulting reduced culpability for Ms. Johnston's death.  The defendants have already received the benefit of a 16-level departure, and it therefore would be highly inappropriate to vary downward further based upon the unusual facts of this homicide.

> 2.  The Stipulated Specific Offense Characteristic Take Into Account the Additional Harm Caused Because the Defendants Committed the Offense Under Color of Law.

Pursuant to U.S.S.G. § 2H1.1(b)(1), the plea agreements provide that each defendant receives a six-level increase because the offense was committed under color of law.  The public places particular trust and responsibility in its law enforcement officers to protect civil rights, and as discussed above, that trust and

---

[11] Similarly, had the defendants' civil rights conspiracy fortuitously not caused bodily injury or death, as was the case in the months leading up to November 21, 2006, the base offense level also would have been level 12, see U.S.S.G. § 2H1.1(a)(2).

responsibility was terribly and repeatedly abused by these defendants.  This significant upward adjustment appropriately reflects that aspect of this case.

3. The Stipulated Upward Adjustments and Departures Take Into Account the Varied Obstructive Conduct in Which the Defendants Engaged.

The defendants' obstructive conduct is described above and in the PSRs.  All three defendants clearly should receive the standard two-level upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1, because each of them willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice by concocting and advancing the false cover story.

As discussed above, however, defendants Smith and Tesler obstructed justice in various ways beyond the conduct engaged in by defendant Junnier.  In particular, Smith planted and destroyed evidence and lied to the FBI in his first interview; and Tesler filed a false report, assisted in destroying evidence, lied to the FBI in his first interview, and also testified falsely in the Fulton County grand jury and trial proceedings.  For this reason, the plea agreements stipulate that defendants Smith and Tesler should receive an additional two-level upward adjustment increase pursuant to U.S.S.G. §5K2.0(a)(3), which states that an upward departure may be warranted "even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such

circumstance is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in that kind of offense." *See United States v. Ventura*, 146 F.3d 91, 97 (2nd Cir. 1998)(affirming two-level enhancement under § 3(c)1.1 and two-level upward adjustment under § 5K2.0, where defendant engaged in separate acts of obstruction); *United States v. Wint*, 974 F.2d 961, 970-71 (8th Cir. 1992)(upholding four-level upward departure for obstruction of justice).

       4.   The Stipulated Guidelines Account for the Defendants' Acceptance of Responsibility.

Pending any developments before or during the sentencing hearing, the Government believes that all three defendants should receive the three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.  Each of the defendants gave a truthful proffer to the FBI (with defendant Junnier coming forward within three weeks of Ms. Johnston's death and truthfully admitting his conduct ever since).  Smith's and particularly Tesler's subsequent inconsistency and minimization on some points (see footnotes 5, 7, and 8 above) gives pause, but ultimately both of them have admitted in their guilty pleas the conduct comprising the offense of conviction.

Defendants Junnier and Smith entered joint guilty pleas to federal and state charges before indictment and less than six months after the crime was discovered, and are clearly entitled to the "third point" under § 3E1.1(b).  (We note that Smith's and

particularly Junnier's relatively prompt cooperation with the Government is properly accounted for in the departure each should receive for substantial assistance, rather than as any further adjustment for acceptance of responsibility.)  Although defendant Tesler declined to plead guilty at that time and took his case to trial in state court, he nevertheless entered his federal guilty plea before indictment, allowing the Government and the Court to allocate their resources efficiently and qualifying for the third point.[12]

---

[12] With respect to decisions regarding defendant Tesler's acceptance of responsibility, veracity on other issues, and requests for a variance or other leniency in sentencing, the Court should be aware of the following exchange during Tesler's sentencing hearing before Fulton County Superior Court Judge Michael D. Johnson on April 21, 2008.  Tesler, under oath, was allocuting, seeking leniency for, among other things, accepting responsibility.  He was then questioned by Assistant District Attorney (ADA) Kellie Hill:

ADA Hill: Do I understand you correctly today in hearing you say that you want to accept responsibility for your actions?
Tesler:   Yes; that's correct.
ADA Hill: Okay. Then I have just one question for you: Do you plan to appeal the jury's conviction?
Tesler:   Do -- Do I plan to appeal it?
ADA Hill: Yes.
Tesler:   **No, I don't.**
ADA Hill: Okay. So you're going to accept the verdict?
Tesler:   **I am going to accept the verdict. I'm at peace with it. And, again, I'm — I'm sorry to you , all, to my wife and my four children. And I plan on accepting punishment today.**

Notwithstanding that sworn testimony, after Judge Johnson sentenced Tesler to near the statutory maximum – 4 ½ years in prison – Tesler did appeal the verdict.

5.   Tesler's Downward Adjustment for Role Properly Accounts for the Defendants' Relative Culpability.

The binding sentencing guideline calculations in the respective plea agreements also properly account for the respective roles of the three defendants in the offense.  As set forth above, defendant Junnier had the highest role in developing the conspiracy, a middle role in the events on November 21, 2006 directly leading to Ms. Johnston's death, and the lowest role in the cover-up.  Defendant Smith had the highest role in the events leading directly to Ms. Johnston's death and the cover-up, and a middle role in the conspiracy before November 21.  Defendant Tesler had the lowest role in the conspiracy before November 21 and in the events on that day, but a middle role in the cover-up.  On balance, as reflected in the plea agreements, defendants Smith and Junnier should receive no adjustment for role in the offense, but defendant Tesler has received a two-level decrease pursuant to U.S.S.G. § 3B1.2(b), because he was less culpable than the other participants in the offense, but not a minimal participant.

The Court may hear much at sentencing about defendant Tesler's purported lesser involvement in the offense, but any lesser role is already properly and fully accounted for in his guideline calculations – in an amount that reflects the facts of this case as well as the Sentencing Commission's accumulated wisdom for how much of a sentence reduction is appropriate for various roles. Moreover, Tesler's lesser role (in comparison to defendant Junnier)

30

was primarily in the portion of the conspiracy leading up to November 21, 2006, which is not the conduct that drives the sentence in this case – and, as discussed in footnote 4 above, Tesler's lesser role even in that portion of the conspiracy stemmed mainly from the fact that Tesler had been in the Narcotics Unit for a shorter period than Smith (by a few months) and Junnier, not any lesser criminal intent or willingness to engage in the criminal conduct.

      6.   <u>The Defendants' Criminal History Category I Properly Reflects Their Prior Good Conduct</u>.

Finally, the PSRs properly calculate each defendant's Criminal History Category as I.  This fully accounts for their lack of any prior criminal records, and it is entirely typical of civil rights offenses involving police officers, who normally cannot become or remain officers if they have any significant criminal record.

      7.   <u>The Adjusted Offense Levels and Guideline Ranges.</u>

Pursuant to these stipulated calculations, defendant Smith's total offense level is 34, with a range of 151-188 months' imprisonment; defendants Junnier and Tesler (assuming credit for acceptance of responsibility) each have a total offense level of 32, with a sentencing range of 121-151 months' imprisonment.  The plea agreements provide that the appropriate guideline sentence is at the low end.

III. **DEFENDANTS JUNNIER AND SMITH ARE ENTITLED TO SENTENCE REDUCTIONS FOR SUBSTANTIAL ASSISTANCE PURSUANT TO U.S.S.G. § 5K1.1.**

   A.   **The Government Will Recommend a Substantial Sentence Reduction to Reflect Defendant Junnier's Unusually Timely, Truthful, and Valuable Assistance.**

On December 11, 2006, just three weeks after Ms. Johnston's death, defendant Junnier, at his request, met for the first time with federal agents.  At that first meeting, facing the potential of a life sentence with a standard proffer letter but before any plea negotiations or plea agreement, Junnier disclosed the truth about his own and other police officers' criminal conduct.  In the local experience of the United States Attorney's Office and the national experience of the Criminal Section of the Civil Rights Division, the speed and extent of Junnier's truthful cooperation is almost unprecedented for a law enforcement officer involved in a broad civil rights conspiracy with fellow officers, much less a homicide that had triggered extraordinary publicity and public attention.

During numerous debriefings over the ensuing weeks and months, Junnier fully confessed his own involvement in the conspiracy and also fully described the roles of defendants Smith and Tesler as well as misconduct by other officers; his accounts were consistent and truthful.  His cooperation allowed the Kathryn Johnston case to be solved in a matter of weeks, with direct evidence from a participant, instead of a matter of months or even years, relying

32

on an uncertain collection of circumstantial evidence and testimony from drug-dealing informants.

Junnier's substantial assistance was critical to obtaining the prompt cooperation and guilty plea of defendant Smith. Junnier was also the most important witness against defendant Tesler. Junnier testified in the state grand jury that indicted Tesler and spent two days on the witness stand at Tesler's state trial.[13] Junnier also would have been the Government's most important witness against Tesler, and his cooperation was valuable in obtaining Tesler's guilty plea. Junnier remains available to testify at the sentencing hearings of his co-defendants if needed.

In addition, Junnier's cooperation led to the investigation of other civil rights violations by other APD officers, resulting in the guilty plea of Sergeant Wilbert Stallings for entering an apartment for which he had no search warrant. Junnier also provided details about the "extra jobs" extortion scheme, assisting the investigation that resulted in the guilty plea of APD Officer Daniel Betts. Finally, the information provided by Junnier assisted APD to make faster decisions regarding reorganization of its Narcotics Unit and other reforms, and it comprises a large part of the information contained in the FBI's report to APD regarding apparent misconduct (not rising to the level of federal criminal

---

[13] The Fulton County District Attorney's description of Junnier's cooperation in the state proceedings is attached hereto as Exhibit 2.

charges) by other officers, which APD is currently using to determine if administrative discipline or other action against those officers is appropriate.

For these reasons, the Government believes that defendant Junnier has provided unusually timely, truthful, and valuable "substantial assistance" under U.S.S.G. § 5K1.1, and pursuant to the standards applied by the United States Attorney's Office in all cases involving cooperating defendants, we expect to recommend a substantial sentence reduction to the Court at sentencing.

**B.    The Government Expects to Recommend a Limited (10 to 20 Percent) Sentence Reduction to Reflect Defendant Smith's Substantial Assistance.**

On January 9 and 10, 2007, after both Junnier and Tesler had given truthful proffers to federal and state officials, defendant Smith met for the second time with FBI agents and admitted his role in the conspiracy.   Subsequently Smith met upon request with federal and state agents on at least a half-dozen occasions.  Smith corroborated much of the information about the defendants' conspiracy that was first provided by Junnier.  Smith also provided information that Junnier did not possess about two of the most serious obstructive acts – the planting of the marijuana in Ms. Johnston's home and the subsequent disposal of the remaining marijuana with Tesler.  The Government believes that defendant Smith's availability to testify assisted in convincing both Junnier and Tesler to enter guilty pleas.

34

In addition, Smith was the first person to focus the Government's attention on the "extra jobs" scheme. Although Smith had less information about the scheme than did Junnier, this focus led ultimately to the investigation of and guilty plea by Officer Betts and additional incriminating evidence against defendant Tesler. Information from Smith about potential misconduct by other officers was also included in the FBI report provided to APD.

Unfortunately, however, the value of Smith's assistance was significantly undercut by two factors within his control. First, his involvement in the ugliest aspects of the conspiracy (lying to the Magistrate Judge to obtain the search warrant for 933 Neal Street, planting the marijuana there, and disposing of the remaining marijuana) as well as his extremely detailed and passionate, but also extremely false, recorded statement to the FBI on December 20, 2006, made him a highly impeachable witness. Second, his post-January 10, 2007, minimization of his own role and inconsistent statements regarding the events leading to Ms. Johnston's death similarly diminished his value as a witness. Thus, because the Government was unable to independently verify some of the most important and unique information provided by defendant Smith, his information and potential testimony was of limited value. Indeed, the Fulton County District Attorney's Office decided not to use Smith as a witness against Tesler in state grand jury proceeding and the state trial.

Because under the standards normally applied by the United States Attorney's Office, defendant Smith did provide substantial assistance in the investigation and prosecution of others, the Government expects to recommend a downward departure pursuant to U.S.S.G. § 5K1.1 at sentencing, but in a limited amount or no more than 10 to 20 percent.

**IV.  BECAUSE THE STIPULATED GUIDELINE CALCULATIONS, INCLUDING DEPARTURES UPWARD AND DOWNWARD, APPROPRIATELY ACCOUNT FOR THE FACTORS IN 18 U.S.C. § 3553(a) AND RESULT IN ENTIRELY REASONABLE SENTENCES, THE COURT SHOULD IMPOSE THE GUIDELINE SENTENCES WITH NO VARIANCES.**

Paragraph 16 of defendant Smith's plea agreement states that "[t]he parties also agree not to seek any upward or downward variances pursuant to *United States v. Booker*, 543 U.S. 220 (2005), nor any upward or downward departures pursuant to the Sentencing Guidelines, except those specified in this agreement."  This reflects the parties' joint view that the guideline sentence for Smith, after the departures discussed above (but no others), is reasonable, and Smith is precluded from seeking any variance.

In contrast, while the plea agreements for defendants Junnier and Tesler preclude them from disputing the guideline calculations, they are permitted to request a variance, and they have each filed such a motion.  For the following reasons, no such variance is necessary or appropriate.

36

**A.    The Nature and Circumstances of the Offense and the Characteristics of the Defendants Are Fully Accounted for in the Stipulated Guideline Calculations.**

As explained in detail in the discussion of the guideline calculations in Sections II and III above, the stipulated sentencing guidelines in this case, including the upward and downward departures provided for under the guidelines, fully take into account both the typical and the atypical nature and circumstances of this offense and the defendants' participation in it, see 18 U.S.C. § 3553(a)(1), including the unusual circumstances of the homicide; the increased harm caused because the offense was committed by police officers under color of law; the defendants' serious but varied obstructive conduct; the defendants' acceptance of responsibility; the relative culpability of the defendants; and the cooperation and assistance provided to the Government by the defendants.   Because these circumstances have been carefully considered and encompassed by the guideline calculations – which reflect the accumulated experience of the federal courts in determining such factors should be weighed -- it would be inappropriate to grant a variance on this ground.

In addition, there are no other characteristics of the defendants that are unusual enough to justify a variance.  See id. Defendants Junnier and Tesler each appear to be very good family men with strong community ties and prior good works, good employment records, and no prior criminal history.  But that is not

37

at all unusual for police officers involved in civil rights offenses – or for many other defendants for that matter – and it is accounted for in the guidelines by their Criminal History Category I.  While the guideline provisions on departures do not restrict the Court's authority under <u>Booker</u>, the Court should take note of the Sentencing Commission's explanations for why these sorts of characteristics are all discouraged grounds for downward departures.  <u>See</u> U.S.S.G. § 5H1.5 (Employment Record); <u>id.</u> § 5H1.6 (Family Ties and Responsibilities); <u>id.</u> § 5H1.11 (Record of Prior Good Works).  The Court should not vary on this ground either.

      **B.**    **The Stipulated Guideline Calculations Also Properly Account for the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; to Afford Adequate Deterrence to Criminal Conduct; to Protect the Public from Further Crimes of the Defendants; and to Provide the Defendants with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

There should be no doubt that this offense – police officers' engaging in a long-term conspiracy to violate civil rights that ultimately resulted in the shooting death of an innocent elderly woman, followed by a diligent and devious effort to cover up the crime – mandates a significant prison sentence.  The stipulated guideline sentences – 12 years and 7 months for Smith, and 10 years and 1 month for Junnier and Tesler, before departures for substantial assistance – reflect the seriousness of the offense; provide just punishment for defendants who engaged in such a

dangerous conspiracy but did not intend to kill anyone; and provide adequate deterrence to other law enforcement officers who might engage in similar civil rights violations.  The guideline sentences also take into account the fact that these defendants pose no significant future threat to the public and need no special correctional treatment.[14]

It is important to analyze the sentence reductions for defendants Junnier and Smith based upon their cooperation with the Government separately from the culpability-related factors that drive the initial length of all three defendants' sentences.  With the exception of culpability issues that render a defendant less credible or useful as a potential witness (as is the case to some extent with Smith), "substantial assistance" is independent of the defendant's culpability; it is recognized in practice and by statute as a mitigating sentencing factor intended to provide an incentive for even the most culpable defendants to assist the Government in solving crimes and bringing other criminals to justice.  See U.S.S.G. § 5K1.1 & comment.

This point is particularly important with respect to reducing defendant Junnier's sentence based upon his almost unprecedented decision to break with his co-conspirators and cross the "blue

---

[14]    The defendants may need certain protections while in custody due to their status as former police officers and cooperation with the Government, but the Bureau of Prisons holds many similarly situated inmates and routinely takes such measures.

line" in his first FBI interview, providing truthful information that allowed the Government to quickly solve a distressing crime and to identify and bring to justice other perpetrators – and also to start alleviating community concerns and assist the Police Department in initiating necessary reforms more quickly. Granting defendant Junnier a substantial sentence reduction for those reasons – without in any way denigrating the seriousness of his crime – is appropriate and indeed will provide an example the Government can use in this district and nationwide to try to convince other law enforcement officers involved in serious civil rights and other criminal conspiracies of the benefit of early and complete cooperation.

In short, while the Government understands that co-defendants should not receive <u>unjustly</u> disparate sentences, we believe that the numerous factors incorporated in the guideline calculations – including the major factor of substantial assistance, which has independent importance in our federal criminal justice system – result in a sentence for each defendant that is entirely just and reasonable, and that the disparities between the co-defendants' guideline sentences are based on well-accepted grounds that reflect the law and the facts and circumstances of the case.

## V.   SENTENCING RECOMMENDATIONS

Based upon all of these considerations, and pending any developments before and during the sentencing hearing, the

Government expects to recommend the following custodial sentences for the defendants:

1.   Defendant Jason R. Smith:  151 months, with a limited (no more than 10 to 20 percent) reduction for his cooperation.

2.   Defendant Gregg Junnier:  121 months, with a substantial reduction for his cooperation.

3.   Defendant Arthur B. Tesler: 121 months (assuming he receives credit for acceptance of responsibility).

Based upon the factors set forth in 18 U.S.C. § 3572, the Government does not recommend the imposition of a fine for any of the defendants, although the Court may consider a community service requirement.  The Government concurs in the PSR's determination that the defendants should be ordered, jointly and severally, to pay restitution in the amount of $8,180.00 to Ms. Johnston's estate for funeral expenses and burial costs.

**VI.   CONCLUSION**

     Wherefore, the Government respectfully requests that the Court sentence the defendants in accordance with the recommendations set forth above, as supplemented at the sentencing hearing.

                      Respectfully submitted,


              /s/   DAVID E. NAHMIAS
                   UNITED STATES ATTORNEY


              /s/   JON-PETER F. KELLY
                   ASSISTANT UNITED STATES ATTORNEY


              /s/   PAIGE M. FITZGERALD
                   SPECIAL LITIGATION COUNSEL
                   CRIMINAL SECTION, CIVIL RIGHTS DIVISION
                   U.S DEPARTMENT OF JUSTICE

CERTIFICATE OF SERVICE

This is to certify that the undersigned has this date caused the foregoing pleading to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorney(s) of record:

John Aspinwall Garland
Garland, Samuel & Loeb
3151 Maple Drive, N.E.
Atlanta, GA 30305
jag@gsllaw.com

Edward T. M. Garland
Garland, Samuel & Loeb
3151 Maple Drive, N.E.
Atlanta, GA 30305
etg@gsllaw.com

Wilmer Parker, III
Maloy, Jenkins, and Parker
75 Fourteenth St., N.W.
25th Floor
Atlanta, GA 30309
parker@mjplawyers.com

William J. McKenney
McKenney & Froelich
50 Polk Street
Marietta, GA 30064
mckfroe@aol.com

This 10th day of February, 2009.

/s/   DAVID E. NAHMIAS
      UNITED STATES ATTORNEY

43